UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| RIPL CORP., a Washington corporation,<br><br>Plaintiff,<br><br>v.<br><br>GOOGLE INC., a Delaware corporation,<br><br>Defendant. | No. 2:12-cv-02050-RSM<br><br>ORDER ON MOTIONS |
| GOOGLE INC., a Delaware corporation,<br><br>Counterclaimant,<br><br>v.<br><br>RIPL CORP., a Washington corporation,<br><br>Counterdefendant. | |

## I.   INTRODUCTION

Before the Court are several discovery-related motions and cross motions for summary

judgment in this trademark infringement action between Plaintiff RIPL Corp. ("RIPL") and

Defendant Google Inc. ("Google"). The Court heard argument on the cross motions for summary

ORDER ON MOTIONS – 1

judgment on March 24, 2014. For the reasons that follow, Google's Motion for Summary

Judgment (Dkt. ## 99, 100) is granted in its entirety; RIPL's Motion for Partial Summary

Judgment (Dkt. # 94) is denied; RIPL's Motion to Dismiss (Dkt. # 55) is stricken as moot;

Google's two Motions to Compel (Dkt. ## 27, 63) and its Motion for a Protective Order (Dkt. #

44) are stricken as moot; RIPL's Sealed Motion to Waive Attorney/Client Privilege (Dkt. # 60) is

stricken as moot; and the remaining Motions to Seal (Dkt. ## 57, 97, 104) are granted.

## II.  BACKGROUND

This is a reverse confusion trademark infringement case between RIPL, the senior user of

"RIPL" and Google, the junior user of "RIPPLES." RIPL was founded in 2005 as Kahuna

Technologies, Inc. ("Kahuna") to develop and operate proprietary software. When Kahuna

obtained the domain name "ripl.com" in 2006, it changed its name to RIPL. It later filed an

application for RIPL as a service mark for use in connection with Internet-related services. RIPL

owns a U.S. Service Mark on "RIPL," Registration Number 3,490,487, which issued on August

19, 2008.

The first identified use of the RIPL mark in connection with consumer services occurred

on March 27, 2007, when RIPL made a "web application for the automated sharing of content

between users based on the interests they share" available to a limited number of University of

Washington students, faculty, and staff with a University of Washington e-mail address. Dkt. #

103, Alger Decl., Ex. A (RIPL Dep. 84:1-21); Dkt. # 102, Alger Decl., Ex. E at 5-7. The March

27, 2007 release was referred to as the "beta launch." RIPL received mixed reviews about the

launch and the user accounts were thought to be "wiped" from the system. *See* Dkt. # 103, Alger

Decl., Ex. B (Messing Dep. 62:6-10).  RIPL then turned its attention to creating its Application

ORDER ON MOTIONS – 2

Programming Interface ("API"), which it released in 2009 or 2010. *See id.* at 146:2-150:6. The API was based on the original automated content sharing software but was designed for corporate customers to run the content sharing software on their own websites. *Id.* RIPL was unsuccessful in licensing the API to any third-party business. *Id.* at 52:3-5. The API was marketed, but never sold, to several media companies.[1]

RIPL's CEO, Bill Messing, has been the sole employee of RIPL since October 2008. Dkt. # 103, Alger Decl., Ex. A (RIPL Dep. 21:25-22:11). RIPL has not filed any tax returns since 2007, and has never had any revenue. Dkt. # 103, Alger Decl., Ex. A and B (Messing Dep. 138:3-13; RIPL Dep. 200:5-10, 237:16-21). Mr. Messing maintains at least one website for the company and states that he will respond to inquiries made to him via e-mail and telephone. Dkt. # 103, Alger Decl., Ex. B (Messing Dep. 67:10-17).

Google+, Google's free social networking site, introduced a new service called Google+Ripples in October 2011. Dkt. # 101, Borovoy Decl. ¶ 3. When activated, Ripples displays a graphic visualization of how content is shared and distributed among Google+ users. *Id.* The feature is only available within the Google+ environment when a user clicks "View Ripples" from a drop down menu. *See id.*

Around February 2012, RIPL began negotiations with a company called Ripple Commerce to license the "phonetic expression of the RIPL trademark." Dkt. # 103, Alger Decl., Ex. R. Ultimately, the deal was unsuccessful. *See* Dkt. # 102, Alger Decl., Ex. D (Sloan Dep. 35:

---

[1] Including: Myspace, Myspace Music, Real Networks, Rhapsody, Universal Music, Vevo, Google, Inc., Google TV, Picasa, Liberty Media, QVC, AOL, Huawei, Yahoo, ROVI Corp., Hewlett-Packard (PC, Palm), Paramount Television, Synergy Sports, Adobe, Apple, Facebook, Sony, Sony Electronics, Sony Music, Amazon, Microsoft, MSN, Xbox, IPTV, Phone, Music, Drive, Windows, Windows Live, Spaces, Mesh, T-Mobile, aQuantive, HTC, Cisco, Amdocs, Akamai, Sub Pop, Overdrive, Classmates, Comcast, The Platform, NBC, Brightcove, Warner Music, Warner Media,Overdrive, Inc. Dkt. # 111-2, p. 9, Billick Decl., Ex. C.

ORDER ON MOTIONS – 3

2-9). At some point during negotiations with Ripple Commerce, RIPL decided that Google's

pending trademark registration for Ripples infringed its trademark rights. RIPL sent Google a

cease-and-desist letter and filed an opposition to Google's registration before the Trademark

Trial and Appeal Board. RIPL also filed this district court action alleging that Google+Ripples

infringes its registered trademark, and infringes its common law trademark rights. In addition,

RIPL asserts claims for false designation of origin, unfair competition, and violation of

Washington's Consumer Protection Act.

### III. DISCUSSION

**A.  Cross Motions for Summary Judgment**

Google has asserted two counterclaims in this action. It seeks to establish that RIPL

abandoned use of the RIPL service mark in commerce, and that the RIPL service mark

registration should be cancelled. RIPL has moved for summary judgment on the abandonment

counterclaim. Google has cross moved for summary judgment on the abandonment counterclaim

and has moved for summary judgment on trademark infringement and damages. Google

contends that there is no likelihood of confusion between the marks to warrant a determination

that Google+Ripples infringes RIPL's service mark. Google also notes that likelihood of

confusion is a required element of each of Plaintiff's additional claims. Thus, if the Court finds

no likelihood of confusion, each of RIPL's claims may be dismissed on summary judgment. The

Court turns first to the issue of abandonment and then to trademark infringement. As resolution

of abandonment and trademark infringement are dispositive of RIPL's claims, the Court does not

address Google's motion with respect to damages. Further, because the Court finds no

infringement as a matter of law, the pending discovery-related motions are now moot.

ORDER ON MOTIONS – 4

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30
31
32
33
34
35
36
37
38
39
40
41
42
43
44
45
46
47
48
49
50
51

1.  Legal Standard

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). In ruling on summary judgment, a court does "not weigh the evidence or determine the truth of the matter but only determine[s] whether there is a genuine issue for trial." *Crane v. Conoco, Inc.*, 41 F.3d 547, 549 (9th Cir. 1994) (citing *FDIC v. O'Melveny & Myers*, 969 F.2d 744, 747 (9th Cir. 1992), *rev'd on other grounds*, 512 U.S. 79 (1994)). Material facts are those which might affect the outcome of the suit under governing law. *Anderson,* 477 U.S. at 248.

The court must draw all reasonable inferences in favor of the non-moving party. *See O'Melveny & Myers*, 969 F.2d at 747. However, the nonmoving party must "make a sufficient showing on an essential element of her case with respect to which she has the burden of proof" to survive summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion" or the court may "grant summary judgment if the motion and supporting materials . . . show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(2)-(3). Whether to consider the fact undisputed for the purposes of the motion is at the court's discretion and the court "may choose not to consider the fact as undisputed, particularly if the court knows of record materials that should be grounds for genuine dispute." Fed. R. Civ. P. 56, advisory committee note of 2010. On the other hand, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's

ORDER ON MOTIONS – 5

position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson,* 477 U.S. at 252.

2.  <u>Abandonment</u>

Under the Lanham Act, a service mark may be any "word, name, symbol, device or any combination thereof—(1) used by a person, or (2) which a person has a bona fide intention to use in commerce and applies to register ... to identify and distinguish the services of one person, including a unique service, from the services of others and to indicate the source of the services, even if that source is unknown." 15 U.S.C. § 1127. The statute defines service marks and trademarks similarly; the marks differ only in the sense that trademarks identify goods while service marks identify services. *Chance v. Pac-Tel Teletrac Inc.*, 242 F.3d 1151, 1156 (9th Cir. 2001); *see* 15 U.S.C. § 1127.

To maintain trademark rights, a mark must be used in commerce. 15 U.S.C. § 1127. For service marks, two elements must be satisfied to meet the "use in commerce" requirement. *Rearden LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190, 1204 (9th Cir. 2012). Use in commerce may be demonstrated when (1) when the service mark is used or displayed in the sale or advertising of services and (2) when the services are rendered in commerce. *Id.* (citing 15 U.S.C. § 1127). Because the test is conjunctive, it is not enough for a mark owner to simply advertise its services: the test requires an "element of actual use" and an "element of display." *Chance*, 242 F.3d at 1159.

A trademark owner abandons its rights "[w]hen use has been discontinued with intent not to resume such use." 15 U.S.C. § 1157. "Nonuse for 3 consecutive years shall be prima facie evidence of abandonment." *Id.* "[U]se of a trademark defeats an allegation of abandonment

when: the use includes placement on goods sold or transported in commerce; is bona fide; is

made in the ordinary course of trade; and is not made merely to reserve a right in the mark."

*Electro Source, LLC v. Brandess-Kalt-Aetna Grp., Inc.*, 458 F.3d 931, 936 (9th Cir. 2006)

(quotation marks omitted).

The statute implies a strict standard. *Id.* at 937; 15 U.S.C. § 1157. To prevail on a claim

for abandonment, the moving party must demonstrate complete discontinuance of use. *See id.* at

937. To determine whether a mark has been abandoned, the Ninth Circuit applies a totality-of-

the-circumstances approach and considers the following factors:

> the genuineness and commercial character of the activity, the
> determination of whether the mark was sufficiently public to identify or
> distinguish the marked service [or product] in an appropriate segment of
> the public mind as those of the holder of the mark, the scope of the
> [trademark] activity relative to what would be a commercially reasonable
> attempt to market the service [or product], the degree of ongoing activity
> of the holder to conduct the business using the mark, the amount of
> business transacted, and other similar factors which might distinguish
> whether a service [or product] has actually been "rendered in commerce."

*Electro Source*, 458 F.3d at 940 (9th Cir. 2006).

Once discontinuance of use has been established, the question of whether a trademark

holder intends to resume use in commerce depends on more than a "purely subjective intention

in the abandoner's mind to re-engage in a former enterprise at some indefinite future time."

*Specht v. Google, Inc.*, 758 F. Supp. 2d 570, 595 (N.D. Ill. 2010). "The registrant must put forth

evidence with respect to what activities it engaged in during the nonuse period or what outside

events occurred from which an intent to resume use . . . could reasonably be inferred." *Imperial*

*Tobacco Ltd., Assignee of Imperial Grp. PLC v. Phillip Morris, Inc.*, 899 F.2d 1575, 1581 (Fed.

ORDER ON MOTIONS – 7

Cir. 1990). Such evidence should include specific plans to use the mark in commerce. *See Specht*, 758 F. Supp. 2d at 595.

As discussed above, RIPL contends that it offers two services in conjunction with the RIPL service mark: a "consumer service" and a "business-facing Application Programming Interface ("API")." Dkt. # 95, Messing Decl., ¶ 6. Google argues that both uses of the RIPL service mark were abandoned.

### a.   The Consumer Service

RIPL's consumer service comprised downloadable software that was first made available, on a restricted basis in 2007, on the ripl.com website. Dkt. # 103, Alger Decl., Ex. A (RIPL Dep., 78:1-15). Once downloaded, the software was designed to show the user media content that was being consumed by other people in her network, and to monitor her media consumption for the purpose of distributing that content to others. *See id.* at 78:15-22. The only evidence in the record that this consumer service was promoted by RIPL and used by any individuals was during the March 27, 2007 beta launch that was limited to university students, faculty, and staff that had a university e-mail address. Dkt. # 103, Alger Decl., Ex. A (RIPL Dep. 84:1-21). RIPL contends that it has not abandoned the RIPL service mark in connection with its consumer service because the "product for individuals has been made available for purchase on the ripl.com website since it went live on March 27, 2007." Dkt. # 110, p. 3. Google, however, contends that the RIPL mark was either never used in commerce, or at best, abandoned in 2008 because there have been no active users of the consumer service since that time, and RIPL has no plans to develop this or any other consumer-facing service in the future. *See* Dkt. ## 99, 100, p. 3.

ORDER ON MOTIONS – 8

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30
31
32
33
34
35
36
37
38
39
40
41
42
43
44
45
46
47
48
49
50
51

Considering the totality of the circumstances, a reasonable jury could not conclude, on this record, that RIPL used its service mark in connection with the consumer service after the 2007 beta launch. First, although RIPL argues in its briefing that the consumer service is available for purchase on the ripl.com website, it has failed to file on the record evidence that it cites to support its assertion. *See* Dkt. # 110, p. 3 (citing Billick Decl., Ex. B, which was never filed in this case). Second, RIPL has submitted no evidence to show any sales of the consumer service, nor has it submitted evidence to show that any individual user downloaded the software. Third, RIPL has submitted no evidence to show that it has engaged in any marketing or promotional activity whatsoever to advertise this consumer service after the beta launch. The only evidence provided or cited by RIPL to support its contention that the consumer service is used in commerce are two statements made by Mr. Messing: that (1) "[t]he RIPL service is and has always been available at the 'ripl.com' domain," and (2) that the last "release" of the consumer product was in 2009. Dkt. # 95, Messing Decl., ¶¶ 7, 6, respectively.

In contrast, Google cites to the deposition testimony of Mr. Messing to show that no consumer ever purchased the consumer service, no purchaser was known to have used the consumer service after the beta launch, and to show that Mr. Messing does not monitor the website to see whether anyone has visited it. Dkt. # 103, Alger Decl., Ex. B (Messing Dep. 30:2-14, 59:5-12, 62:6-64:21); Alger Decl., Ex. G at 8. Construing the evidence in the light most favorable to RIPL, the record suggests only that a 2009 version of the consumer service was made available on RIPL's website, but RIPL has supplied no evidence to show that any consumer purchased or used the service, or whether anyone even visited the site. Applying the relevant factors, there is no evidence of commercial activity, no evidence that the website,

ORDER ON MOTIONS – 9

service, or mark was sufficiently public to create an association between the mark and its owner,

and no evidence of marketing activity beyond maintaining the website past 2007. Moreover,

RIPL has failed to provide evidence to show that a customer could purchase the consumer

service from its website. *See Specht*, 758 F. Supp. 2d at 593 (concluding that mere maintenance

of a website was not a bona fide use in commerce); *see also In re Genitope Corp.*, 78 U.S.P.Q.2d

1819 (T.T.A.B. 2006) (website indicating how a customer could obtain more information about a

product, but not containing information on how to purchase a product, constituted mere

advertising and was not acceptable to show trademark use).  On balance, RIPL has not provided

evidence that it rendered its consumer service in commerce after the 2007 beta launch.[2]

Accordingly, the Court finds that RIPL has not used the service mark in connection with the

consumer service for more than three years such that abandonment may be presumed.

To meet the second prong of the abandonment inquiry, Google must show that RIPL did

not have an intent to resume use of the mark in commerce. Although RIPL argues that Google

must prove that it had "no intent to abandon" the mark, it has misstated the standard.

"Abandonment under § 1127 requires an intent not to resume trademark use, as opposed to a

prospective intent to abandon the mark in the future." *Electro Source*, 458 F.3d at 937. The Ninth

Circuit has recognized that "[n]othing in the statute entitles a registrant who has formerly used a

mark to overcome a presumption of abandonment arising from subsequent non-use by simply

averring a subjective affirmative 'intent not to abandon.'" *Id.* (quoting *Imperial Tobacco Ltd.*,

899 F.2d at 1581.

---

[2] The Court assumes, but does not decide, that the consumer service was used in commerce in the first
instance.

ORDER ON MOTIONS – 10

Here, RIPL has not offered evidence of a plan to resume use of the mark in conjunction with its consumer-facing service. As RIPL's 30(b)(6) deponent, Mr. Messing testified that RIPL expected to leave the consumer service "in the state it's in" while RIPL developed the business-facing API. Dkt. # 103, Alger Decl., Ex. A (RIPL Dep. 213:16-22). He further testified that at some unknown later date, RIPL "may go back to the consumer service." *Id.* at 213: 23-24 - 214:1-4. Such evidence does not constitute an intent to resume use.

RIPL has presented no evidence to demonstrate that RIPL has actively promoted or sold to the consumer-facing market beyond the 2007 beta launch. RIPL has also failed to provide evidence that it has specific plans to reenter the consumer market. Thus, RIPL abandoned use of the mark in connection with its consumer-facing service.

### b. RIPL's Business-facing API

Although this is a closer question, RIPL has failed to provide evidence from which the Court could infer that RIPL has used the RIPL mark for anything beyond mere advertising since 2010, nor has RIPL offered evidence of concrete plans to establish a future bona fide commercial use of its API.

RIPL relied exclusively on the declaration of RIPL CEO Bill Messing to establish use in commerce in its cross motion for summary judgment.  He states:

> RIPL had just embarked on a promotional push with the launch of the marketing site in 2012 when it became aware of Google's attempted registration of the "Ripples" mark. It makes no sense to seek investment dollars while under attack by Google, so RIPL Corp. has been operating on a shoestring budget until this cloud is lifted. That means making sure the web site is available, making sure that visitors have the ability to contact the company by email and phone, and pursuing leads opportunistically. RIPL Corp. commonly receives inquiries about the RIPL API and web site, and I pursue those leads whenever feasible.

ORDER ON MOTIONS – 11

Dkt. # 95, Messing Decl., ¶ 9.

In response to Google's cross motion for summary judgment, RIPL relied exclusively on its attorney's declaration and the attached exhibits for evidence of use of the mark in commerce with respect to the API. The relevant exhibits contain the following: (1) RIPL's response to Google's Interrogatory  No. 6, in which RIPL states that it "dedicated most of 2011 to developing customers for the API" and that it changed its website in 2012 (Dkt. # 111-2, p. 12, Billick Decl., Ex. C); (2) RIPL's response to Google's Interrogatory No. 12, in which RIPL states that "2010 included numerous pitch meetings with prospective business partners," that in 2011 its "resources did not allow it to hire personnel or promote extensively," and that in 2012 it created a new website for the API and followed "up on its marketing efforts with numerous prospects at the annual Consumer Electronics show in Las Vegas" (Dkt. # 111-4, pp. 8, Billick Decl., Ex. E); and (3) e-mails from 2010 that describe a summary of business communications made between RIPL and several businesses (Dkt. # 111-5, pp. 2-4, Billick Decl., Ex. F). Importantly, there are no e-mails or other evidence to show that RIPL conducted business meetings to promote the sale of the API after 2010. For use of the mark past 2010, the record suggests only that RIPL changed the website for the API and that it attended a trade show in 2012.

As discussed above, maintenance of a website alone is insufficient to demonstrate use in commerce because RIPL has failed to demonstrate that its website provides customers with information on how to purchase its products. In addition, RIPL has failed to demonstrate that its attendance at a trade show in 2012 constituted use in commerce sufficient to overcome a presumption of non-use of the mark past 2010. RIPL has not detailed what sales efforts it has

ORDER ON MOTIONS – 12

made or whether its attendance at the trade show amounted to something more than "unsolicited proposal(s) . . . that lead nowhere." *Natural Answers, Inc. v. SmithKline Beecham Corp.*, 529 F.3d 1325, 1330 (11th Cir. 2008) (holding that evidence of a failed putative negotiation after abandonment was insufficient to demonstrate an intent to resume use). Although "non-sales activities such as solicitation of potential customers may be taken into account as part of the totality of the circumstances inquiry[,]" RIPL's vague allusions to a 2012 "promotional push" do not countenance a finding that RIPL's API was rendered in commerce. *Rearden LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190, 1205 (9th Cir. 2012) (internal quotations and citations omitted).

In contrast, Google has cited to numerous instances in the record that support a finding of abandonment. First, RIPL has never sold or licensed any product or service under the RIPL mark in the business market. Nor does it currently have any customers. Dkt. # 103, Alger Decl., Ex. B (Messing Dep. 52:3-5, 81:2-4). Second, RIPL's CEO Bill Messing testified that "[w]e're not actively promoting right now." Dkt. # 103, Alger Decl., Ex. A (RIPL Dep. 96:23, 284:25-285:1). He also stated that with respect to the website: "I'm not acting on visits to the site, no . . . . If they contact me, I will follow up on it." Dkt. # 103, Alger Decl., Ex. B (Messing Dep. 69:5-16, 71:6-14). Third, RIPL has provided no evidence of its business reputation. Mr. Messing testified that RIPL's brand equity and reputation are "unknowable" and he failed to identify a single person who could testify about its business reputation. Dkt. #103, Alger Decl., Ex. A (RIPL Dep. 204:14-206:20; 232:14-233:11).

To survive summary judgment, RIPL must provide actual evidence of use in commerce and intent to resume use, which it has failed to do. RIPL could have provided screen shots of the website and explained how the website works, or provided testimony from potential clients about

ORDER ON MOTIONS – 13

RIPL's ongoing solicitation efforts or its reputation in the industry. But RIPL has offered nothing concrete to rebut Google's arguments and relies only on RIPL's maintenance of the RIPL website and allusions to limited promotional activity to demonstrate use of the mark in commerce. Further, RIPL has provided no evidence of a plan to resume use of its mark in connection with the API. Accordingly, summary judgment is GRANTED in Google's favor.

   3.   Trademark Infringement – Likelihood of Confusion

   To prevail on a trademark infringement claim in a reverse confusion case, the plaintiff must demonstrate (1) that it is the senior user; (2) of a valid trademark; (3) and that the defendant—or junior user—is using its mark in a way that is likely to confuse the plaintiff's customers into believing that they are dealing with the defendant. *Brookfield Comm., Inc. v. West Coast Ent. Corp.*, 174 F.3d 1047, 1053 (9th Cir. 1999). "The core element of trademark infringement is the likelihood of confusion, *i.e.*, whether the similarity of the marks is likely to confuse customers about the source of the products." *Brookfield*, 174 F.3d at 1053. In *AMF, Inc. v. Sleekcraft Boats*, the Ninth Circuit Court of Appeals delineated an eight factor test to determine whether there exists a "likelihood of confusion" between the marks at issue. 599 F.2d 341, 348-49 (9th Cir. 1979), *abrogated in part on other grounds as recognized by in Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792 (9th Cir. 2003). The *Sleekcraft* factors are (1) strength of the mark; (2) proximity of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) type of goods and degree of care likely to be exercised by the purchaser; (7) defendant's intent in selecting the mark; and (8) likelihood of expansion of product lines. *Id.* Because the likelihood of confusion analysis is a factual inquiry, the issue before the court is "whether a reasonable jury could conclude that a consumer might

ORDER ON MOTIONS – 14

reasonably believe that" RIPL's service is actually Google's service. *One Industries, LLC v. Jim O'Neal Distributing, Inc.*, 578 F.3d 1154, 1162 (9th Cir. 2009).

"The Sleekcraft factors are intended to function as a proxy or substitute for consumer confusion, not a rote checklist." *Rearden*, 683 F.3d at 1209. Further, not all *Sleekcraft* factors may be relevant in a particular case. *Id.* ("[a] determination may rest on only those factors that are most pertinent to the particular case"). Because the likelihood of confusion inquiry is inherently factual and open-ended, summary judgment is often disfavored. *Id.* at 1210. However, the Ninth Circuit has affirmed summary judgment rulings "[i]n cases where the evidence is clear and tilts heavily in favor of a likelihood of confusion[.]" Id. (quoting *Au-Tomotive Gold, Inc. v. Volkswagen of Am., Inc.*, 457 F.3d 1062, 1075 (9th Cir. 2006)).

### a. Strength of the Marks

The conceptual, or inherent, strength of a trademark is evaluated on a spectrum that assigns more strength to marks that are fanciful or arbitrary, and less strength to those that are merely generic or descriptive of the goods they represent. *See, e.g.*, *Surfvivor Media, Inc. v. Survivor Productions*, 406 F.3d 625, 631-32 (9th Cir. 2005). In the middle are those that are suggestive. *See id.* at 632. Suggestive marks require an inferential or imaginative step to connect the trademark to the good or service offered. *Id.* The strength of both the senior and junior mark is relevant in a reverse confusion trademark action. *Id.*

The RIPL and Ripples services are broadly related to content sharing over social media. Neither mark is descriptive of the service provided; each requires an inferential step to associate the propagation of "concentric, circular waves" with the propagation of media content over

ORDER ON MOTIONS – 15

social media. Thus, both marks are suggestive, which means that, conceptually, they are assigned moderate strength along the strength spectrum.

"Identifying whether a mark is generic, descriptive, suggestive, arbitrary or fanciful, however, is only the first step of the inquiry. The second step is to determine the strength of the mark in the marketplace." *One Industries*, 578 F.3d at 1164 (quotations and citations omitted). Importantly, "[w]hen similar marks permeate the marketplace, the strength of the mark decreases." *Id.* Both marks are weakened by the presence of several ripple-like marks operating within the social media sphere. *See M2 Software, Inc. v. Madacy Entertainment*, 421 F.3d 1073, 1088 (9th Cir. 2005) ("Use of similar marks by third-party companies in the relevant industry weakens the mark at issue.").  For example, Google's trademark search revealed "RIPPLR" for use with social media strategy and marketing, "Ripple Group" associated with business analysis in the digital media content and technology industry, "ripplusa" associated with social media services, "Ripple Tag" associated with social networking, "webripples" associated with social media, and "MEDIA RIPPLE" associated with software for managing and sharing digital media content. *See* Dkt. # 116, Alger Decl., Ex. A. Because RIPL and Ripples operate in a relatively crowded field of ripple-associated trademarks, their market strength is weakened. Moreover, RIPL has presented no evidence to demonstrate commercial strength because it has failed to provide any evidence of actual marketplace recognition. RIPL could have submitted evidence such as advertising expenditures to demonstrate heightened commercial strength of its mark, but it has failed to do so. *See Network Automation, Inc. v. Advanced Systems Concepts, Inc.*, 638 F.3d 1137, 1149 (9th Cir. 2011) ("advertising expenditures can transform a suggestive mark into a strong mark") (quotation and citation omitted). In sum, both marks are weakened by a lack of

ORDER ON MOTIONS – 16

commercial strength. Because RIPL has failed to raise a genuine issue of material fact, this factor favors Google.

### b.  Proximity of the Goods, and Type of Goods and Degree of Care of Purchaser Factors

"The standard for deciding whether the parties' goods or services are 'related' is whether customers are 'likely to associate' the two product lines." *Surfvivor Media*, 406 F.3d at 633 (quoting *Dreamwerks Production Group, Inc. v. SKG Studio*, 142 F.3d 1127, 1131 (9th Cir. 1998)). Goods and services may be related when they are "sold to the same class of consumers." *Nautilus Grp., Inc. v. Savvier, Inc.*, 427 F. Supp. 2d 990, 996 (W.D. Wash. 2006). But "[w]hen fundamental functionality is distinct, the case supports a finding of 'no confusion.'" *Real Networks, Inc. v. QSA ToolWorks, LLC*, Case No. C07-1959 MJP, 2009 WL 2512407, at *4-5 (W.D. Wash. Aug. 14, 2009).

Google+Ripples is a feature that is available to every Google+ account holder. On the Google+ site, there is a dropdown menu that allows a Google+ user to "View Ripples." Dkt. # 101, Borovoy Decl., ¶ 3. When activated, the feature allows the user to see a display of how public postings have been shared and reshared among other Google+ users. *Id.* As noted before, a user does not purchase a Google+ account, nor can the user purchase the Ripples feature. Both are free. *Id.* at ¶ 7.

RIPL's products are functionally different. The consumer facing product comprises software that may be downloaded. The software collects information about the user's media content and is designed to "push" that content to other users within the network so that they would automatically receive media content without having to search for it. The business facing

ORDER ON MOTIONS – 17

product is an expensive piece of software that RIPL has marketed to large media companies so that they could enable their own websites with the "push" technology.

Although RIPL contends that the goods are related "because the RIPL product both collects and displays data from social media, and . . . Google's Ripples displays data from the Google+ social media site," that argument ignores the functional differences between how the products work and their intended consumer. Mr. Messing testified that RIPL's main function is "to automate the distribution of content from one user to another based on the interests they share." Dkt. # 103, Alger Decl., Ex. B (Messing Decl. 153:2-9). He then acknowledged that "[n]obody else can make that statement." *Id.* at 153:9-10. In contrast, "Google+Ripples does not push or cause the automated republication of content nor does it track consumption of content (*i.e.*, whether users have read or listened to a piece of media)." Dkt. # 101, Borovoy Decl., ¶ 6. RIPL has failed to support its argument with evidence that demonstrates similarity of RIPL and Google's services. Further, Mr. Messing's testimony directly contradicts RIPL's argument that the services are functionally the same.

Similarly, RIPL has failed to demonstrate that the intended consumers of RIPL and Ripples would exercise the same degree of care in purchasing the RIPL and Ripples services. The degree of care exercised by consumers is measured under the reasonably prudent consumer standard. *See, e.g.*, *Brookfield*, 174 F.3d at 1060. This standard requires courts to consider the price of the products at issue and the level of sophistication expected of a consumer purchaser. *Id.*

Here, both the price of products and the sophistication of the intended consumers are different. For RIPL's consumer-facing technology, it maintains a passive website and does not

ORDER ON MOTIONS – 18

monitor web traffic. The only time the software was actually known to be used was during the 2007 beta launch. RIPL has proffered no evidence to show that it actively markets its consumer facing product to any individuals. For the API, RIPL has stated that it marketed the API to large corporations. *See* Dkt. # 103, Alger Decl., Ex. B (Messing Dep. 67:22-24) (stating that RIPL is seeking "one strategic customer for the API").  RIPL's intended customers appear to be large companies that would have savvy purchasing arms. RIPL has provided no evidence to demonstrate that users of Google's free service exercise the same degree of care as a potential customer of RIPL's API.  Although Plaintiff argues that Google also markets its Ripples feature to large companies, the argument misses the point. A large company would exercise a different level of sophistication when considering purchasing RIPL's API versus utilizing a free Google feature. Thus, these factors collectively favor Google.

### c.  Similarity of the Marks

To determine whether the marks are similar, the court must compare their sight, sound, and meaning. *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1146 (9th Cir. 2002). The Ninth Circuit has developed the following axioms to guide the similarity analysis:  (1) "the marks must be considered in their entirety and as they appear in the marketplace," (2) "similarity is adjudged in terms of appearance, sound, and meaning," and (3) "similarities are weighed more heavily than differences." *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1206 (9th Cir. 2000) (citations omitted). Although sound and meaning in this case are similar, the Court finds that when the marks are considered in their entirety, they differ dramatically by sight and by how they are presented in the marketplace.

ORDER ON MOTIONS – 19

The marks are visually distinct when considered in their entirety. First, RIPL is a short-form derivative of ripple. RIPL's CEO chose the derivative because he wanted a mark that was "edgy" like Motorola's adoption of RAZR. Dkt. # 103, Alger Decl., Ex. A (RIPL Dep. 54:22-55:10, 57:9-20). The CEO saw value in not adopting the full spelling of ripple. *See id.* Ripples, on the other hand is the full, seven character plural form of the common word, ripple. Second, Google's mark, as used in the market place, is usually attached to Google+ as depicted below. Dkt. # 101, Borovoy Decl., ¶ 5. Ripples appears in plain, lowercase blue font, and is often presented in association with the Google+ house mark. *Id.*



Third, RIPL's mark has three forms, two of which use decorative, thicker font and have concentric rings around or near the mark. The less-stylized font version has a tag line that reads "social discovery for digital media." Dkt. # 103, Alger Decl., Ex. DD; *id.*, Ex. A (RIPL Dep. 59:17-69:22).

Although both marks use blue font and lowercase letters, the marks are differentiated by RIPL's use of decorative font, concentric circles, and a tagline, as opposed to Google's use of unadorned font. RIPL wholly failed to address the visual distinctions raised by Google and states only that "inspecting logos side-by-side should be done with great caution." Dkt. # 110, p. 14. Notably, RIPL fails to support that statement with any citation. Courts have often found marks to be

ORDER ON MOTIONS – 20

dissimilar by comparing the same visual distinctions made here. *See, e.g.*, *Nautilus*, 427 F. Supp. 2d at 996 (finding marks dissimilar where different fonts used); *see also Surfvivor Media*, 406 F.3d at 633 (finding no material issue of fact where one mark usually displayed with a slogan or stylized graphics).  As the case law makes clear, "marks are to be considered in their entirety and as they appear in the marketplace."  *GoTo.com*, 202 F.3d at 1206. Because RIPL has failed to explain or demonstrate how the marks, when considered in their entirety, are similar, it has not raised a genuine material issue of fact.

### d.  Evidence of Actual Confusion

RIPL has supplied no evidence of actual confusion. This factor also favors Google.

### e.  Marketing Channels

Convergent marketing channels increase the likelihood that a consumer would be confused as to the origin of the goods. *Sleekcraft*, 599 F.2d at 353. Plaintiff contends that RIPL and Ripples share the same marketing channel because the products are marketed over the internet.

Mere use of the internet, however, is insufficient to show that the parties operate within the same marketing channel. *See Network Automation*, 638 F.3d at 1151. ("Today, it would be the rare commercial retailer that did not advertise online, and the shared use of a ubiquitous marketing channel does not shed much light on the likelihood of consumer confusion."); *RealNetworks*,  2009 WL 2512407 at *5 (W.D. Wash. Aug. 14, 2009). The RIPL API is marketed to sophisticated purchasers acting on behalf of companies. The Ripples mark is marketed to existing and future Google+ account holders, some of whom may be the same large companies, but none would reasonably confuse Google's free service with RIPL's software

ORDER ON MOTIONS – 21

platform.[3] Aside from citing generic use of the internet, RIPL has failed to submit any evidence that shows that the RIPL and Ripples marks share similar marketing channels. This factor favors Google.

### f. Google's Intent in Selecting the Mark

A plaintiff need not demonstrate that the alleged infringer intended to deceive consumers to prevail on a claim for trademark infringement. *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1293 (9th Cir. 1992). But if the plaintiff provides evidence that the alleged infringer knowingly adopted a similar mark, the court must presume that the defendant intended to deceive the public. *Sleekcraft*, 599 F.2d at 354.

Plaintiff has presented no evidence to show that Google knew about the RIPL mark prior to adopting Ripples. Google supplied the results of its internal trademark search, which show that the search did not reveal the RIPL trademark. *See* Dkt. # 116, Alger Decl., Ex. A. In addition, Google's 30(b)(6) designee, Rick Borovoy, stated that Google's trademark search did not identify RIPL or its mark and that no individual on the team involved in selecting Ripples had any knowledge of RIPL or its mark. Dkt. # 101, Borovoy Decl., ¶ 4. RIPL contends that Google must have found the RIPL mark during its trademark search and is therefore "hiding" relevant information from RIPL. This theory stems from counsel's review of Google's privileged e-mail communications that were at issue earlier in the case. Although the Court has not determined that the e-mails are admissible, it previously reviewed the e-mails that were filed under seal and notes that they do not support RIPL's theory that Google knew about RIPL or its mark when it adopted

---

[3] RIPL also contends that it markets to casual users by maintaining a website where the software may be downloaded. It has provided no evidence that any particular casual user has visited the site or downloaded that software.

ORDER ON MOTIONS – 22

Ripples.  Plaintiff's argument is pure speculation and unsupported by the evidence. Thus, the factor favors Google.

### g.   Likelihood of Product Line Expansion

"Inasmuch as a trademark owner is afforded greater protection against competing goods, a 'strong possibility' that either party may expand his business to compete with the other will weigh in favor of finding that the present use is infringing." *Sleekcraft*, 599 F.2d at 354 (quotations and citation omitted). RIPL has provided no evidence that demonstrates that it is likely to expand its business to compete with Google+ users. Although RIPL contends that RIPL's services are "available to . . . casual individual users of Google+" (Dkt. # 110, p. 20), it has failed to show that it has any "casual individual users" and has further failed to show that it is likely to market a service to those users in the future. As noted by the *Groupion* court, "what is relevant is the substance of the two companies' respective products and services, not the characterizations or labels offered by the parties regarding the products and services." *Groupion, LLC v. Groupon, Inc.*, 859 F. Supp. 2d 1067, 1080 (N.D. Cal. 2012). As discussed above, RIPL has failed to provide evidence that demonstrates that Google+Ripples is functionally similar to RIPL's services or that each is intended to reach the same consumer. This factor also favors Google.

### h.   Summary of Sleekcraft Analysis

Having considered the evidence in the light most favorable to RIPL, the Court finds that RIPL has failed to raise a material issue of fact as to any *Sleekcraft* factor such that the marks are not confusingly similar as a matter of law. Because likelihood of confusion is a required element for each of RIPL's alleged causes of action, RIPL's complaint is DISMISSED in its entirety.

ORDER ON MOTIONS – 23

**IV. CONCLUSION**

Having considered the motions, the response and replies thereto, the attached declarations and exhibits, oral argument, and the remainder of the record, the Court hereby finds and ORDERS:

(1) Google's Motion for Summary Judgment (Dkt. ## 99, 100) is GRANTED;

(2) RIPL's Motion for Partial Summary Judgment (Dkt. # 94) is DENIED;

(3) The pending Motions to Seal (Dkt. ## 57, 97, 104) are GRANTED;

(4) Google's Motion for Protective Order (Dkt. # 44) is STRICKEN AS MOOT;

(5) Google's First and Second Motions to Compel (Dkt. ## 27, 63) are STRICKEN AS MOOT;

(6) RIPL's Motion to Dismiss (Dkt. # 55) is STRICKEN AS MOOT;

(7) RIPL's Sealed Motion to Waive Attorney/Client Privilege (Dkt. # 60) is STRICKEN AS MOOT.

DATED this 3rd day of April 2014.

RICARDO S. MARTINEZ
UNITED STATES DISTRICT JUDGE

ORDER ON MOTIONS – 24